UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                :
GRACE-MARIE O'DONNELL,                          :        05-CV-610 (ARR)
                                                :
                        Plaintiff,              :        NOT FOR ELECTRONIC
                                                :        OR PRINT
        -against-                               :        PUBLICATION
                                                :
CLUB MEDITERRANEE S.A., CLUB MED, INC., CLUB    :        OPINION AND ORDER
MED HOLDING, N.V., CLUB MED FINANCE B.V.,       :
CLUB MED SALES, INC., HOLIDAY VILLAGES          :
(PROVINCIALES TURKS AND CAICOS), LTD., and      :
CLUB MEDITERRANEE (BAHAMAS) LTD.,               :
                                                :
                        Defendants.             :
                                                :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

    Plaintiff, Grace-Marie O'Donnell, brought this personal injury action against defendants,

several entities belonging to the Club Med group, in New York State Supreme Court, Kings

County, on October 13, 2004.  On February 2, 2005, defendants removed the action to this court

pursuant to 28 U.S.C. § 1332(a)(2), invoking this court's diversity jurisdiction.  Plaintiff moved

to remand this matter to state court and defendants moved to dismiss the action on the ground of

*forum non conveniens*.  For the reasons set forth below, both motions are denied.

## BACKGROUND

### A.    The Parties

####     1.    Plaintiff

    Plaintiff, Grace-Marie O'Donnell, is a resident of Kings County, New York.  Compl. at ¶ 1.

She purchased a vacation package from defendant Club Med Sales, Inc. through Liberty Travel

Agency in Oceanside, New York. The terms of the package included plaintiff's meeting with a Club Med Sales representative at JFK International Airport on October 13, 2001, and thereafter boarding a chartered flight to a resort villa in the Turks & Caicos Islands, which was owned and operated by another Club Med entity. See Ex. 8 to Pltf.'s Mot. for Remand (Dkt. No. 47-8).[1]

According to the complaint, on October 15, 2001, plaintiff set out on a scuba diving expedition arranged by Club Med, specifically by defendant Hotel and Villages (Providenciales Turks & Caicos), on a dive boat named "Bat Ray." Compl. at ¶ 39. At some point during the excursion, plaintiff abandoned the dive and attempted to board the boat by climbing a side ladder, which provided access between the water and the boat. Id. According to the complaint, the ladder was slippery and the dive boat did not have a lookout on board to help plaintiff climb on board. Plaintiff slipped as she was trying to board the Bat Ray and suffered an ankle fracture, for which she was treated immediately by a physician in Turks & Caicos. Id.

Plaintiff then returned to New York on October 17, 2001. As a result of her injuries, she required surgical intervention on October 22, 2001, at Sisters of Charity Medical Center in Staten Island, New York, and on January 28, 2003, at Saint Vincent's Hospital, also in Staten Island. See Pltf.'s Aff. in Supp. of Mot. for Remand at ¶¶ 11-12 (Dkt. No. 47-1).

## 2. Defendants

The instant action lists seven (7) defendants, which are referred to herein collectively as "defendants" or "Club Med."

---

[1] The exact relationship between Liberty Travel Agency and the defendants is not clear form the record, but plaintiff asserts that the agency has been "authorized by Club Med to sell vacation packages" in New York. See Pltf.'s Aff. in Supp. of Mot. for Remand at ¶ 3. (Dkt. No. 47-1).

Defendant Club Méditerranée, S.A., is a corporation organized in France as a "société anonyme" that is "in the business of owning, operating, and developing vacation resorts and hotels." See Decl. of Edouard Silverio and Attachment Thereto, submitted as Ex. A to Defs.' Opp. to Remand (Dkt. No. 48-1) (hereinafter "1st Silverio Decl."). In essence, Club Méditerranée, S.A. is the global parent of a network of corporations that own and operate vacation resorts and hotel businesses throughout the world; it is a publicly traded company with share capital of more than € 77.4 million and market capitalization of € 761 million, as of the end of 2005, see Club Méditerranée Annual Report 2005 submitted as Ex. 12 to Pltf.'s Aff. in Supp. of Mot. for Remand at 1, 12-13 (Dkt. No. 47-12) (hereinafter "Club Méditerranée 2005 Report"). It owns subsidiaries, directly and indirectly, in 40 countries, see id.; Club Méditerranée Group Consolidated Financial Statements, submitted as Ex. I to Defs.' Opp. to Remand, at 80-85 (Dkt. No. 48-9) (hereinafter "2005 Financial Statements"). Although the operations of the Club Méditerranée subsidiaries span the globe, the general counsel of the company has attested that the company has its main office in Paris, France, that the "overwhelming majority of corporate officers work in the Paris office," and that the majority of the company's corporate and business decisions are made in France. See 1st Silverio Decl. at ¶ 3. In addition, Club Méditerranée does not share any directors or officers with any of the other defendants, see id. at ¶¶ 7-13; it keeps separate office space, bank accounts, and books and records from each of the other defendants, and files separate tax returns. See id. at ¶¶ 14-16. Club Méditerranée, S.A. is not authorized to do business in, and does not own any real property or have any corporate offices in New York. See id. at ¶ 4.

Defendant Club Med, Inc. was a wholly owned subsidiary of Club Méditerranée, organized as a corporation in the Cayman Islands, with its head office located in the Cayman Islands. See Club

Med, Inc., Certificate of Incorporation, submitted as Ex. C to Defs.' Opp. to Remand (Dkt. No. 48-3); 2005 Financial Statements at 109; Decl. of Eileen Kett, submitted as Ex. B. to Defs.' Opp. to Remand (Dkt. No. 48-2) at ¶ 6 (hereinafter "1st Kett Decl."). The company was dissolved in March of 2007. See Ex. C. to Defs.' Opp. to Remand. Before its dissolution, Club Med, Inc. was, like its parent Club Méditerranée, in the business of managing hotel and resort businesses, as well as travel agencies and tour operators for those businesses, see id. It was not authorized to do business in New York, nor did it own any real property or have any corporate offices in New York. See 1st Kett Decl. at ¶ 7.

Defendant Club Med Sales, Inc., is a wholly owned subsidiary of Club Méditerranée, S.A., incorporated in the State of Delaware with its headquarters in Coral Gables, Florida. According to the declaration of its general counsel, Eileen Kett (who is also one of Club Med Sales, Inc.'s vice-presidents), Club Med Sales is authorized to do business in at least 8 states, including New Jersey and New York, and it has employed airport representatives in other states. See 1st Kett Decl. at ¶ 4. However, Club Med Sales has corporate offices only in Arizona and Florida, and, according to Kett, the "overwhelming majority" of its employees are located in those two states. Id. at ¶ 3. In addition, Club Med Sales, Inc. did not, at the time of commencement of this action, have any corporate offices, telephone listings, or real property in New York, id. at ¶ 5, nor did it have more than eight employees in New York. Id. Club Med Sales is the entity from which plaintiff purchased the vacation package that is at issue in this case, see Ex. 8 to Pltf.'s Mot. for Remand. At times, Club Med Sales did business simply as "Club Med." See, e.g., Ex. 8 to Pltf.'s Mot. for Remand (statement of plaintiff's vacation purchase from Club Med Sales, Inc., bearing a "Club Med" logo).

Defendant Hotel Villages (Providenciales Turks & Caicos), Ltd., hereinafter referred to as "Providenciales," is a limited liability corporation organized under the laws of Turks & Caicos, in the British West Indies, see Ex. E to Defts.' Opp to Remand, and is a wholly owned indirect subsidiary of defendant Club Méditerranée, S.A. See 2005 Financial Statements at 109; see also Decl. of Eileen Kett submitted as Ex. A. to Defts.' Aff. of 3/3/08, at ¶ 4, (Dkt. No. 54-2) (hereinafter "2nd Kett Decl.") (stating that the sole shareholder of Providenciales since October 2001 has been Club Med Amerique du Nord, S.A., a limited liability company organized under the laws of France); Decl. of Eduardo Silverio submitted as Ex. C to Defts.' Aff. of 3/3/08, at ¶¶ 2-5, (Dkt. No. 54-5) (hereainfater "2nd Silverio Decl.") (stating that Club Méditerranée, S.A. is the sole shareholder of Club Med Amerique du Nord, S.A.).

Like the other named defendants except Club Med Sales, Inc., Providenciales, and its sole shareholder, Club Med Amerique de Nord, S.A., have, at all relevant times, (1) not been authorized to do business in New York State, see 1st Kett Decl. at ¶ 11; 2nd Silverio Decl. at ¶ 4, (2) not owned property in New York State, see 1st Kett Decl. at ¶ 10; 2nd Silverio Decl. at ¶ 4, and (3) not had any officers, directors, or employees working in New York State, see 2nd Kett Decl. at ¶ 4, 2nd Silverio Decl. at ¶¶ 3-4. Providenciales owns the Club Med resorts in Turks & Caicos where plaintiff was on vacation when she was injured, id. At times, it has conducted its affairs simply as "Club Med." See, e.g., Ex. 11 to Pltf.'s Mot. for Remand (boat leasing agreement in which Providenciales is referred to as "Club Med").

Defendant Club Méditerranée (Bahamas), Ltd., herein referred to as Club Med Bahamas, is a wholly owned indirect subsidiary of defendant Club Méditerranée, S.A., organized as a limited liability corporation under the laws of the Commonwealth of the Bahamas, with its principal

registered office in the Bahamas.  See Ex. F. to Defs.' Opp. to Remand; 2005 Financial Statements at 109; 1st Kett Decl. at ¶ 12.  During all periods relevant to this litigation, the shareholders of Club Med Bahamas consisted of Club Med, Inc., as well as nominee shareholders Eoz Limited and Arion Limited, two limited liability companies incorporated under the laws of the Bahamas, not licensed to do business in New York, and owned entirely by citizens of the Commonwealth of the Bahamas. See 2nd Kett Decl. at ¶ 6 (stating membership of Club Med Bahamas); Aff. of Clement T. Maynard III submitted as Ex. B.  to Defs.' Aff. of 3/3/08, at ¶¶ 3-6 (Dkt. No. 54-4) (Arion Limited and Eoz Limited are Bahamas limited liability companies not authorized to do business in New York, and with no property, officers, directors, or employees in New York).  At times, Club Med Bahamas has conducted its affairs simply as "Club Med." See, e.g., Exhibit to Decl. of Joseph Lemaire, submitted as Ex. B  to Defs.' Mot. to Dismiss (boat leasing agreement in which Bahamas referred to as "Club Med").

Finally, defendants Club Med Holding, N.V., and Club Med Finance, B.V., were, up to the moment of their dissolution in early 2001, incorporated in the Netherlands Antilles and the Netherlands, respectively, with their head offices and principal places of business outside of the United States.  See 1st Kett Decl. at ¶¶ 8-9; see also Decl. of Francis Beleau submitted as Ex. D to Defs.' Aff. of 3/3/08, at ¶ 1 (Dkt. No.54-6) (hereinafter "Beleau Decl.") (Club Med Holding N.V. had registered office in Netherlands and principal place of business in Luxembourg).  Club Med Holding, N.V., was dissolved in Luxembourg upon the acquisition of all of its shares by defendant Club Med, Inc., see Ex. D. to Defs.' Opp. to Remand (indicating that Club Med Holding N.V. was dissolved as of May 2001 upon the decision of its new owner, Club Med, Inc.).  Club Med Finance, B.V. was dissolved in Luxembourg on June 29, 2001 by resolution of its sole shareholder, Club Med

Asie, S.A.  <u>See</u> Beleau Decl. at ¶ 2; <u>see also</u> Certificate of Dissolution <u>submitted as</u> Exhibit to Beleau

Decl.  In addition, the record indicates that Club Med Asie, S.A. is a limited liability company

organized under the laws of, and with its principal place of business in, Luxembourg, <u>see</u> Beleau

Decl. at ¶¶ 4-5, and that the only shareholders of Club Med Asie, S.A., have been, at all relevant

times, Club Med Amerique du Nord, S.A. and Club Méditerranée, S.A.  <u>Id.</u> at ¶ 6.

> **3.**     **Other Relevant Facts**

>> ***a. Other Club Med Entities***

At least two other non-party entities of the Club Med conglomerate are relevant to this

motion.  The first is Club Med Management Services, Inc., an indirect wholly owned subsidiary of

Club Méditerranée, S.A.  <u>See</u> 2005 Financial Statements at 109.  It is organized in the State of New

York and it is directly owned by defendant Club Med Sales, Inc.  <u>See</u> Ex. G to Defs.' Opp. to

Remand; 1st Kett Decl. at ¶ 15.  Club Med Management Services shares at least three directors and

officers with its parent, Club Med Sales, including Vice-President Eileen Kett, as well as office

space in Florida.  <u>See id.</u> at ¶¶ 21-22.  It also appears to file consolidated U.S. federal income tax

returns with Club Med Sales.  <u>Id.</u> at ¶ 19 (stating that Club Med Management Services files separate

tax returns from all defendants except Club Med Sales, Inc., but only "separate *state* tax returns"

from that defendant) (emphasis added).

The second entity is Club Med Boutique, Inc., which was, before its dissolution in early

2003, a New York corporation.  <u>See</u> Ex. H to Defs.' Opp. to Remand (indicating dissolution of New

York corporation).  It had its principal executive office in New York, New York.  <u>See</u> Ex. 14 to

Pltf.'s Mot. for Remand.

### b. Seminole Catamarans and the Lease Agreement

In addition to the defendants, the other relevant party is Seminole Catamarans, Ltd., ("Seminole"), the owner of the boat "Bat Ray" aboard which plaintiff was injured. Seminole is a company incorporated under the laws of Turks & Caicos, see Agreement Between Club Med (Bahamas) and Seminole Catamaran, Ltd., dated May 1, 1999, attached as Ex. 2 to Decl. of Joseph Lemaire (Dkt. No. 45-2) (hereinafter "Boat Rental Agreement"). It is undisputed that Seminole is an entity which is wholly separate in ownership from Club Med. In December of 1997, Seminole entered into an agreement with defendant Club Med Bahamas, by which Seminole agreed to purchase from Club Med Bahamas a number of boats, including the boat "Bat Ray." See Sale Agreement, submitted as Ex. 10 to Pltf.'s Mot. for Remand. As part of the sale agreement, Seminole agreed to leave the Bat Ray at the disposal of Club Med (Bahamas) under a renewable rental agreement for the following five years. Id.

Although it is not clear from the record whether the two parties immediately entered into such a rental agreement, it is clear that Club Med Bahamas and Seminole entered into a rental agreement valid from May 1999 through October 2002, under which Seminole leased the Bat Ray to Bahamas for use in scuba diving expeditions originating from the vacation resort located at Providenciales, Turks and Caicos. See Boat Rental Agreement. In addition, Seminole agreed to purchase general liability insurance, worth at least "$US 50 million per occurrence," to indemnify Club Med for personal and property damages incurred on the boat. Id. Finally, the agreement provides that, although Club Med has exclusive control of the boat throughout the life of the lease, Seminole shall provide the captain and crew of the boat and shall be responsible for making weekly maintenance and repairs. Id.

**B.    Procedural History**

Plaintiff brought the instant action against Club Med on October 13, 2004, in the Supreme Court of the State of New York, Kings County, alleging, inter alia, negligence against the defendants and seeking damages for her injuries.  On February 2, 2005, defendant Club Med Sales, Inc., filed a notice of removal of the action from the state court to this court.  See Notice of Removal (Dkt. No. 1).  The grounds for removal were stated as the diversity of the parties.  See id. at ¶ 2. After completing some discovery, plaintiff moved to return this action to state court under 28 U.S.C. § 1447(c), alleging that there is no complete diversity between the parties, and defendants moved to dismiss the action pursuant to Fed. R. Civ. Proc. 12(b) on the grounds of *forum non-conveniens*. Each party opposed the other's motion.

**DISCUSSION**

**A.    Plaintiff's Motion to Remand to State Court**

A federal district court has subject matter jurisdiction over an action when a federal question is presented or there is complete diversity of citizenship between the parties to the lawsuit.  Diversity jurisdiction exists  "where the matter in controversy exceeds the sum or value of $75,000 [...] and is between (1) citizens of different States [or] (2) citizens of a State and citizens or subjects of a foreign state."  28 U.S.C. § 1332(a).  It is well established that for diversity jurisdiction to exist, diversity must be "complete," i.e, the state of residence of each of the plaintiffs in a case must differ from that of each defendant.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373-74 (1978); Herrick Company, Inc. v. SCS Communications, Inc., 251 F.3d 315, 322 (2d Cir. 2001).  If even one plaintiff is a resident of the same state as one defendant, there is no complete diversity and

a federal court lacks subject-matter jurisdiction. See Frisone v. Pepsico, Inc., 369 F.Supp.2d 464, 470 (S.D.N.Y. 2005).  Moreover, the relevant inquiry is the citizenship of the parties at the time the lawsuit was commenced, not at the time when the incident that gives rise to the litigation occurred. See, e.g., Linardos v. Fortuna, 157 F.3d 945, 947 (2d Cir. 1998).

It is also axiomatic that "the party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete," Herrick Company, 251 F.3d at 322-32 (citing Advani Enter., Inc. v. Underwriters at Lloyds, 140 F.3d 157, 160 (2d Cir. 1998)), that diversity must be established by a preponderance of the evidence, see, e.g., Makarova v. United States, 201 F.3d 110, 113 (2d Cir 2000);  Frisone, 369 F.Supp.2d at 469 (S.D.N.Y. 2005) (quoting Augienello v. Fed. Deposit Ins. Corp., 310 F.Supp.2d 582, 587 (S.D.N.Y. 2004)), and that a court may look to facts outside of the pleadings in deciding a motion to dismiss for lack of diversity.  See Makarova, 201 F.3d at 113; Frisone, 369 F.Supp.2d at 469-70.  Finally, until discovery is complete, the party invoking the court's diversity jurisdiction need not establish conclusively the place of citizenship of each party; that party need only establish that diversity is not destroyed by the residence of any party.  See Sweet Pea Marine, Ltd. v. APJ Marine, Inc., 411 F.3d 1242, 1248 n.2 (11th Cir. 2005) (collecting cases).

For diversity purposes, a corporation is a resident "of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c).  In this circuit, the principal place of business of a corporation is determined by one of two tests, depending upon whether the corporation's activities are centralized or decentralized.  See Frisone,

369 F.Supp.2d at 470-71.[2]  A corporation is decentralized if its operations are spread across numerous states.  A corporation is centralized if its activities are conducted mostly in one state.  See id.; Augienello, 310 F.Supp.2d at 590; Center for Radio Information, Inc. v. Herbst , 876 F. Supp. 523, 525 (S.D.N.Y. 1995).

If a corporation's activities are decentralized, courts in this circuit use the "nerve center" test to determine a corporation's principal place of business.  See Frisone, 369 F.Supp.2d at 470-71.  A corporation's nerve center is the place from "which the corporation radiates out to its constituent parts and from which the corporation's officers direct, control, and coordinate all activities."  Id. (quoting Scot Typewriter Co. v. Underwood Corp., 170 F. Supp. 862, 865 (S.D.N.Y. 1959)).  "In other words, the 'nerve center' test places the principal place of business at the location of a company's headquarters."  Peters v. Timespan Comm., Inc., No. 97-CV-8750, 1999 WL 135231, at *3 (S.D.N.Y. Mar. 12, 1999).

On the other hand, if the corporation's activities are centralized, its principal place of business will be determined by the "locus of operations" test, which looks to the state in which the corporation has its greatest impact on, or its most extensive contacts with, the general public.  See R.G. Barry Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 655 (2d Cir. 1979); Frisone, 369 F.Supp.2d at 471; Center for Radio Info., Inc., 876 F.Supp. at 525.  Under this test, a corporation that generally fashions its business policy and makes management decisions in a single state is deemed to have its principal place of business in that state. See Egan v. American Airlines, Inc., 324 F.2d 565, 566 (2d Cir. 1963).

---

[2]      If a corporation has ceased doing business or is otherwise inactive, its principal place of business is the place where it last conducted business.  See Augienello, 310 F.Supp.2d at 590.

Finally, it is important to note that the citizenship of an entity that in the United States is considered, under corporate law principles, a "limited liability company," is determined by applying the relevant principal place of business tests to its shareholders or members. See Handelsman v. Bedford Village Associates Ltd. Partnership, 213 F.3d 48, 51-52 (2d Cir. 2000) (citing Cosgrove v. Bartolotta, 150 F.3d 729, 731 (7th Cir. 1998)).[3]

### 1.     Defendants' Burden of Proof Regarding Principal Place of Business

Applying these principles to the instant case, it is undisputed that: (1) defendants bear the burden of establishing diversity jurisdiction because they removed the action from New York State court; (2) the amount in controversy in this case exceeds $75,000 because plaintiff seeks over $2 million in money damages, see Compl. at ¶¶ 46, 53, 60, 67, 74, 81, 88; (3) plaintiff, Grace-Marie O'Donnell, is a resident of New York State; see Notice of Removal at ¶ 3(a); Compl. at ¶ 1; (4) the appropriate date on which to apply the relevant citizenship tests to the defendants is October 13, 2004, when this lawsuit was commenced; and (5) at that time, none of the seven defendants was incorporated in New York; Notice of Removal at ¶ 3; Compl. at ¶¶ 2,6, 11, 16, 24, 31.[4]  Accordingly,

---

[3]      That a foreign corporate entity uses the words "limited liability" does not itself indicate that it is a "limited liability company" for purposes of U.S. law and the diversity statute. Cf. Handwick Holdings, Ltd. v. Carver Boat Corp., 93 F.Supp.2d 1043, 1044 n. 2 (E.D.Wis. 2000) (noting that Bahamian corporation called a "limited" company was alleged not to be a limited liability company to which the test of Cosgrove should apply).

[4]      Although plaintiff in her verified complaint states, upon information and belief, that defendant Club Med Sales, Inc., was incorporated in New York, see Compl. at 21, the defendants have submitted the sworn declarations of their officers attesting to the places of incorporation of the different corporations involved in this litigation, see Kett Aff. at ¶ 1 (stating that Club Med Sales, Inc. is a Delaware corporation) and the plaintiff has not challenged these assertions.

in order to meet the burden of establishing diversity jurisdiction, defendants must establish that none of the seven defendants had its principle place of business in New York State when this lawsuit began. The defendants have met this burden.

Turning first to the principal place of business of each defendant except Club Med Sales, Inc. (collectively referred to as "non-U.S. defendants"), the defendants have established that none directly owns or owned property in New York, and that none is or was licensed to do business in New York. See generally 1st Silverio Decl. at ¶¶ 3-4; 1st Kett Decl. at ¶¶ 6-13; Beleau Decl. at ¶ 3. Moreover, no non-U.S. defendant has ever had any offices or employees in New York, see id., and none has ever had any officers or directors in New York. Id.[5] Without corporate offices in New York, and without any officers or directors to make decisions in New York, none of the non-U.S. defendants could make most of its managerial decisions in New York. Thus none could have its "nerve center" in New York. See, e.g., Powers v. Fox Television Stations, 907 F.Supp. 719, 722 (S.D.N.Y. 1995) (holding that defendant's nerve center is California because "all of its corporate officers are located [in California;] the overwhelming majority of [its] officers and directors are in California [and all of defendant's] major operations decisions are made in California.").

Moreover, absent any office or employee in New York State, no non-U.S. defendant could have most of its business contacts in New York. The locus or place of operations test would thus set the principal place of business of each non-U.S. defendant outside of New York. See, e.g.,

---

[5]     The record establishes that, with respect to Club Méditerranée, S.A., the principal registered office is located in Paris, France, and that "the overwhelming majority of [its] corporate officers and directors are located in the Paris area and the overwhelming majority of corporate officers work in the Paris office, including the Chairman, Chief Executive officer, Chief Financial Officer, Executive Vice-Presidents, and the members of the Corporate Executive Committee." See 1st Silverio Decl. at ¶ 3.

Frisone v. Pepsico, Inc., 369 F.Supp.2d 464, 471-72 (S.D.N.Y. 2005) (applying "place of operations" test to determine that corporation does not have principal place of business in New York because it had no office and no employees there, even though its parent company was a New York corporation). Indeed, the plaintiff seems to concede that all of the non-U.S. defendants have their principal places of business outside of New York State. See Compl. at ¶¶ 2, 6, 11, 16, 24, 31.

In addition, the court notes that it is not clear from the present submissions whether the defendant entities that were organized as "limited liability corporations" in their respective jurisdictions, that is, Club Med Finance B.V., Providenciales, and Club Med Bahamas, are entities to which the rule of Handelsman v. Bedford Village Associates Ltd. Partnership, 213 F.3d 48, 51-52 (2d Cir. 2000), imputing to the entity the citizenship of each of its members, should apply. Even if the court were to look to the citizenship of the members of these entities, however, it is clear from the record that none of their members, or the members of their members, had its principal place of business in New York. This is because, as established by the record, see supra at pp. 6-7, all of the L.L.C. members (and members of those members) were either actual persons who are citizens of a foreign country, or entities that owned no property and were not licensed to conduct business in New York and were thus not citizens of New York for the reasons set forth above, see supra at pp. 12-13.

Turning to Club Med Sales, Inc., defendants have offered the testimony of Eileen Kett, its general counsel, to establish that the entity is authorized to do business in New York as well as in seven other states, and that it employs airport representatives in a number of states, see 1st Kett Decl. at ¶ 4. Ms. Kett also avers that Club Med Sales, Inc., has corporate offices only in Florida and Arizona. See id. at ¶ 3. Thus, it is not clear whether the operations of Club Med Sales, Inc. are "centralized" or "decentralized" for purposes of identifying the applicable corporate citizenship test.

The ambiguity is immaterial, however, because the record establishes that Club Med Sales, Inc. does not have its principal place of business in New York under either the locus of operations or the nerve center test.

Applying the locus of operations test, the evidence establishes that Club Med Sales, Inc. did not have most of its business contacts in New York at the start of this lawsuit. This is so because Club Med Sales, Inc. had no more than eight employees and no corporate office in New York State, see id. at ¶ 5, none of its corporate decisions were made in New York, its main headquarters was not in New York, and most of its corporate records were maintained outside of New York. See id. at ¶ 3. Moreover, the evidence establishes that Club Med Sales, Inc. had business contacts with clients in at least eight states, and not mostly in New York State.

Applying the nerve center test, the evidence establishes that all of Club Med Sales' corporate decisions are made in either Florida or Arizona, see id. at ¶ 4, thus precluding a finding that New York is its principal place of business, see Powers, 907 F.Supp.2d at 722-23; see also First Nat. Ins. Co. of America v. Joseph R. Wunderlich, Inc., 358 F.Supp.2d 44 (N.D.N.Y. 2004) (using nerve center test to determine that corporation was citizen of Washington State because all of its principal officers and decision-makers were there, despite the fact that the corporation had some agents in New York); Kubin v. Miller, 801 F.Supp. 1101, 1112 (S.D.N.Y. 1992) (defendant has principal place of business in New York under nerve center test because all of its executive officers work there full time); see also Petroleum & Energy Intelligence Weekly v. Liscom, 762 F.Supp. 530, 535 (S.D.N.Y. 1989) (company had principal place of business in New York under nerve center test because all but four of its employees and all of its leases to do business were in New York, although work done prior to the company's incorporation had been conducted outside of New York). Therefore, under either

the nerve center or locus of operations test, the defendants have met their burden of establishing that, with respect to all of them, their principal places of business are` not New York State.

### 2. Plaintiff's Response Regarding Defendants' Principal Place of Business

In her motion for remand, plaintiff does not argue that any of the seven defendants individually had its principal place of business in New York. Instead, plaintiff argues that New York is the state of residence of the defendants collectively, based not on the well-established nerve center or place/locus of operations tests, but rather on a different theory for establishing a corporation's place of business. Specifically, plaintiff argues that because of the degree of control that the corporate parent, Club Méditerranée, S.A., exerts over all of its corporate subsidiaries, and because of the commonality of the business operations of the defendants, those subsidiaries are "alter-egos" of the parent and, as such, the parent acquires the domicile of each of its subsidiaries, including those incorporated in New York. See Pltf.'s Mem. of L. in Supp. of Mot. for Remand at 7-11 (Dkt. No. 47-18) (hereinafter "Pltf.'s Mem. for Remand"). Thus, plaintiff argues, Club Méditerranée, S.A. is a citizen of New York because two of its indirectly owned subsidiaries, Club Med Management Services, Inc. and Club Med Boutique, Inc., are citizens of New York. Plaintiff's argument is founded on the "alter-ego" theory of corporate liability, under which courts will not respect corporate formalities and will instead "pierce the corporate veil" so as to hold the parent liable for the debts of the subsidiary. See generally Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138-40 (2d Cir. 1991).

Federal courts are divided as to the applicability of alter-ego analysis to the determination of a corporation's citizenship for purposes of determining federal diversity jurisdiction. On the one hand, the Fifth Circuit has held that applying alter-ego analysis in this context is proper, and that if

a subsidiary is determined to be the alter-ego of its parent corporation, then the parent is deemed to be a citizen of, inter alia, the place where the *subsidiary* is incorporated. See Freeman v. Northwest Acceptance Corp., 754 F.2d 553 (5th Cir.1985). On the other hand, the D.C. Circuit has held that alter-ego analysis is *never* proper to determine a corporation's citizenship, and that only the rules of § 1332 should be used. See Pyramid Securities Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1120-21 (D.C. Cir. 1991). Finally, most other courts adopt an intermediate approach that acknowledges that a separately incorporated entity is entitled to a presumption that it has its own principal place of business, see, e.g., Powers v. Fox Television Stations, 907 F.Supp. 719, 723 (S.D.N.Y. 1995). Such courts consider alter-ego analysis only if it is found that the two corporations have not respected the corporate formalities of separate incorporation, separate directors and officers, and separate books and records. See, e.g., Topp v. Compair Inc., 814 F.2d 830, 835-36 (1st Cir. 1987). If corporate formalities are disregarded and if, upon conducting alter-ego analysis, the court determines that the subsidiary is in fact the alter-ego of the parent, the court will attribute the activities of the subsidiary to the parent (or vice-versa) in determining the corporation's principal place of business. See Danjaq v. MGM/UA Communications, 773 F.Supp. 194, 197 (C.D. Cal. 1991) aff'd sub nom Danjaq v. Pathe Communications Corp., 979 F.2d 772 (9th Cir. 1992).[6] The Second Circuit has not ruled on this issue.

---

[6]     See also Powers v. Fox Television Stations, Inc., 907 F.Supp. 719, 723-24 (S.D.N.Y. 1995) (noting that alter-ego analysis is a departure from the general rule, but applying it to determine whether parent exerts too much control over subsidiary); In re Air Disaster Near Cove Neck, New York, 774 F.Supp. 718, 720 (E.D.N.Y. 1991) (applying alter-ego factors to determine jurisdiction of corporation for purposes of Warsaw Convention). But see Frisone v. Pepsico, 369 F.Supp.2d 464, 472-73 (S.D.N.Y. 2005) (refusing to attribute activities of parent to determine citizenship of subsidiary, noting general rule that a separately incorporated entity is considered to have its own principal place of business).

All of the courts that look beyond the traditional rules of corporate citizenship and attribute the activities of a subsidiary to a parent, however, do so only after determining, by applying the appropriate tests, that the subsidiary is in fact the alter-ego of the parent. In this case plaintiff has not established that any of the Club Med entities are alter-egos of each other. Thus, the activities and place of incorporation of Club Med Boutique and Club Med Management are irrelevant to the citizenship of the Club Med defendants.

In advancing her alter-ego theory, plaintiff argues that all Club Med entities are alter-egos of each other and should be treated as a single entity, because: (a) Club Med employees around the world report indirectly to Club Méditerranée's offices in Paris; (b) Club Med officers in Paris make decisions about relocating the employees of its subsidiaries; (c) Club Méditerranée, S.A. has a single "national coordinating counsel" for its activities in the United States, which it shares with the other Club Med entities; (d) all Club Med entities do business under the "Club Med" name and advertise using the same logo; (e) the annual reports of Club Med speak of Club Méditerranée, S.A. and all of its subsidiaries as a single, consolidated entity, combining its revenue, profits, and operations; (f) Club Med Sales, Inc. and Club Med Management Services, Inc. share office space in Florida; and (g) Ms. Kett is the *only* attorney employed by both Club Med Sales, Inc. and Club Med Management Services, Inc. and is an officer of both companies. See generally Pltf.'s Aff. in Supp. of Mot. for Remand at 10-21 (Dkt. No. 47); Pltf.'s Rep. Aff. in Supp. of Mot. for Remand at 4-5 (Dkt. No. 49-1). Of these facts, only the last two are relevant to alter-ego analysis.

The Second Circuit has looked at the following factors to determine whether one corporation is the alter-ego of another:

"(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate

existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own."

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991). The analysis depends on the totality of the facts, and no one factor is dispositive. See, e.g., Freeman v. Complex Computin Co., Inc., 119 F.3d 1044, 1053 (2d Cir. 1997).

In this case, plaintiff has established the existence of factor (4) with respect to the activities of Club Med Sales, Inc. and Club Med Management, by showing that Ms. Kett is an officer of both corporations (see fact (g) above), and the existence of factor (5) because those two entities share office space in Florida (see fact (f) above). However, these two facts simply show overlap in the operations of the Club Med Sales and Management; they do not establish that "[d]ominion [is] so complete [and] interference so obtrusive, that by the general rules of agency [Club Med Sales is] a principal and [Club Med Management is] an agent." Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Intern., Inc., 758 F.Supp. 908, 918 (S.D.N.Y. 1991) (quoting Berkey v. Third Ave. Ry., 244 N.Y. 84, 155 N.E. 58 (1926)).

Notably, plaintiff has not established the existence of any of the other eight factors with respect to the relationship between Club Med Sales and Club Med Management or Boutique, nor has she shown the existence of *any* of the factors between either Club Med Management or Boutique and any other Club Med entity. Although the plaintiff "is not required to show that all ten of the

*Passalacqua* factors weigh in favor of [her] claim," <u>Powers</u>, 907 F.Supp. at 723, it is telling that she has failed to adduce any evidence to establish eight of them. <u>See, e.g.</u>, <u>id.</u> (failure to establish 7 of 10 factors does not overcome presumption that subsidiary has its own place of incorporation); <u>Matsumara v. Benihana Nat. Corp.</u>, No. 06-CV-7609, 2007 WL 1489758, at *6 (S.D.N.Y. May 21, 2007) (same). Plaintiff, by adducing no evidence that the Club Med entities are not adequately capitalized, that they did not respect the corporate formalities of separate incorporation and separate boards of directors, or that the corporations do not deal at arm's length with each other, has failed to establish the degree of control and domination between the Club Med entities needed to rebut the presumption that each separately incorporated entity has its own principal place of business.

The remaining facts that plaintiff highlights, <u>see supra</u> at p. 18, are not relevant to alter-ego analysis. More specifically, facts (a), (b), and (c), that is, employee indirect reporting to and relocation by Club Méditerranée, S.A. in Paris, and the existence of a single "coordinating counsel," highlight that Club Méditerranée, S.A. exerts some control over hiring decisions that affect the company globally. They do not, even in combination with other evidence, establish that there is such a degree of domination and control of a parent over a subsidiary that the subsidiary is "reduced to an alter ego," <u>Feitshans v. Kahn</u>, No. 06-CV-2125 (SAS), 2007 WL 2438411, at *4 (S.D.N.Y. Aug. 22, 2007). Accordingly, they do not rebut the presumption that each has its own separate place of business. <u>See also</u> <u>Topp</u>, 814 F.2d at 836 ("the fact that the parent owned all of the subsidiary's stock, and the control incident to that ownership, do not justify ignoring the otherwise separate character of the two corporations") (citations omitted). In addition, facts (d) and (e), that the entities use the same name and logo and annually report their operations as a consolidated group, are common in corporate conglomerate structures such as that of the Club Med entities, and simply

20

establish commonality in the resources and goals of the Club Med entities, but do not demonstrate control or domination of one entity over the other.

Having failed to establish that Club Med Management Services is the alter-ego of any Club Med defendant, plaintiff cannot show that any of the defendants should be considered a citizen of New York for diversity purposes.[7]  Plaintiff's motion to remand this case to state court is therefore denied.

## B.  Defendants' Motion to Dismiss on *Forum Non-Conveniens* Grounds

Defendants have moved to dismiss the action on the grounds of *forum non-conveniens*. Generally speaking, a decision on such a motion "reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." <u>Sinochem Int'l. Co., Ltd. v. Malaysia Int'l. Shipping Corp.</u>, 127 S.Ct. 1184, 1190 (2007).  The inquiry is fact-intensive and district courts normally have significant discretion in deciding whether or not to dismiss the case on *forum non-*

---

[7]  Other cases cited by plaintiff are inapposite because they do not concern diversity jurisdiction.  Some concern solely personal jurisdiction, <u>see, e.g.</u>, <u>Koehler v. Bank of Bermuda Ltd.</u>, 101 F.3d 863 (2d Cir. 1996) (noting use of "doing business" test for purposes of establishing personal jurisdiction over an out-of-state corporation); <u>Volkswagenwerk Aktiengesellschaft v. Beech Aircraft</u>, 751 F.2d 117 (2d Cir. 1984) (personal jurisdiction in New York over out-of-state corporation based on presence of its subsidiary in New York); <u>Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.</u>, 475 F.Supp.2d 456 (S.D.N.Y. 2007) (applying alter-ego analysis to determine whether New York courts have personal jurisdiction over out-of-state investment funds).  Others concern alter-ego analysis in the context of piercing the corporate veil for the purposes of imputing liability.  <u>See, e.g.</u>, <u>Bridgestone/Firestone Inc. v. Recovery Credit Services, Inc.</u>, 98 F.3d 13 (2d Cir. 1996) (applying alter-ego test to pierce corporate veil and hold parent company liable for debts of its subsidiary); <u>William Wrigley Jr. Co v. Waters</u>, 890 F.2d 594 (2d Cir. 1989) (applying alter-ego analysis to determine whether to pierce corporate veil and impose personal liability on corporate agent);  <u>Marine Midland Bank, N.A. v. Miller</u>, 664 F.2d 899 (2d Cir. 1981) (same); <u>Rolls-Royce Motor Cars Inc. v. Schudroff</u>, 929 F.Supp. 117 (S.D.N.Y. 1996) (applying alter-ego analysis to determine whether to pierce corporate veil and impose liability upon corporate shareholder).

*conveniens* grounds. See generally Iragorri v. United Technologies Corp., 274 F.3d 65, 72 (2d. Cir. 2001) (en banc) (decision on *forum non conveniens* motion "lies wholly within the broad discretion of the district court") (quoting Scottish Air Int'l, Inc. v. British Caledonian Group, 81 F.3d 1224, 1232 (2d Cir. 1996)).

The inquiry proceeds in three parts. As a threshold matter, the court must determine the degree of deference owed to a plaintiff's choice of forum. The Second Circuit has said that a plaintiff's choice of her home district is entitled to great deference because there is less likelihood that the choice was motivated by forum-shopping or other improper tactics. See Iragorri, 274 F.3d at 71 (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 (1981) ("a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum") (quoting Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)). See also In re Matter of Arbitration Between Monegasque de Reassurances v. Nak Naftogaz of Ukraine, 311 F.3d 488, 498 (2d Cir. 2002). In this case, plaintiff is a resident of Kings County, New York; thus, her choice of New York courts is entitled to great deference.[8]

Although a plaintiff's choice of her home forum is entitled to great deference and sets a high barrier for dismissal, the choice "does not dispose of a *forum non conveniens* motion [;] it is only the first level of inquiry." See Iragorri, 274 F.3d at 73; see also In Re Cinar Corporation Securities

---

[8]    Although the Second Circuit has clarified that determining the degree of deference owed to a plaintiff's choice of her home forum in the United States is not "an abrupt or arbitrary" exercise, see Norex Petroleum Ltd v. Access Industries, Inc., 416 F.3d 146, 154 (2d Cir. 2005), this is not a case like Norex Petroleum where there is reason to believe that the local plaintiff chose her local forum for invalid reasons. On the contrary, at least some relevant witnesses in this case, the plaintiff and her treating physician, are present in this forum, and no one disputes that the defendants are amenable to suit here. Compare Norex Petroleum, 416 F.3d at 155. In fact, the defendants do not dispute the high degree of deference that plaintiff's choice of her home forum is owed under Iragorri.

Litigation, 186 F.Supp.2d 279, 297 (E.D.N.Y. 2002) (deference owed plaintiff's choice "does not automatically resolve the forum non conveniens issue in favor of the plaintiffs; the defendants must now demonstrate that they will suffer a great deal of inconvenience to warrant a rejection of plaintiffs' choice of forum.").

After determining the appropriate level of deference, analysis of a *forum non-conveniens* motions proceeds in two steps. First, the court must determine whether there is an adequate alternative forum for the lawsuit. Second, the court must determine whether dismissal is proper by balancing the hardship to the parties under the private and public interest factors set forth by the Supreme Court in Gulf Oil Corporation v. Gilbert, 330 U.S. 501 (1947). See, e.g., Iragorri, 274 F.3d at 73-74; Wiya v. Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000). The Second Circuit has said that, in balancing these factors, "the greater degree of deference to which the plaintiff [...] is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing [...] dismissal." Iragorri, 274 F.3d at 74. At the same time, the court must also balance "the greater convenience to the defendant of litigating in its preferred forum against any greater inconvenience to the plaintiff if the plaintiff is required to institute the suit in the defendant's preferred foreign jurisdiction." Id. at 75. Nevertheless, when "plaintiff is an American citizen and the alternative forum is foreign, the balance must be even stronger [in favor of the defendant]." Massaquoi v. Virgin Atlantic Airways, 945 F.Supp. 58, 60-61 (S.D.N.Y. 1996) (citation omitted); see also Koster, 330 U.S. at 524 (noting that plaintiff should not be deprived of her home jurisdiction "except upon a clear showing of facts which . . . establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience.").

23

### 1. Whether There is an Adequate Alternative Forum

To establish that there is an adequate alternative forum for the lawsuit, the defendants must show that "[they] are amenable to service of process [in that forum] and the forum permits litigation of the subject matter of the dispute." Nak Naftogaz, 311 F.3d at 499 (citing Piper Aircraft, 454 U.S. at 254 n.22); see also Ilusorio v. Ilusorio-Bildner, 103 F.Supp.2d 672, 674 (S.D.N.Y. 2000). Although at least one court in this circuit has found Turks & Caicos to be an adequate forum for personal injury actions, see Lan Associates XVIII, L.P. v. Bank of Nova Scotia, No. 96-CV-1022 (JFK), 1997 WL 458753, at *3-4 (S.D.N.Y. Aug. 11, 1997), the parties nevertheless disagree as to whether Turks & Caicos constitutes and adequate alternative forum. "[I]t is not necessary [...] to get caught up in analyzing the forum's adequacy in this case, [however], as the Gilbert factors are dispositive of the forum non conveniens issue." Cinar Corp. Securities Litigation, 186 F.Supp.2d at 299-300. Because close analysis of the Gilbert factors establishes that this is not a proper case for dismissal, the court will assume, without deciding, that Turks & Caicos is an adequate alternative forum.

### 2. Application of the *Gilbert* factors

#### (a) Private factors

The private factors that the court must consider under Gilbert are: "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive." DiRienzo v. Philip Services Corp., 294 F.3d 21, 29-30 (2d Cir. 2002) (quoting Gilbert, 330 U.S. at 508). In analyzing these

factors, the Second Circuit has instructed that a district court should carefully consider the type of evidence that would be relevant at the trial. See Iragorri, 274 F.3d at 74. In this case, it cannot be said that a balancing of these factors strongly favors the defendants.

Defendants argue that the first Gilbert factor favors dismissal because they would be hard pressed, without the subpoena power of a court in Turks & Caicos, to gain access to evidence that is not in New York but is required to try the case. Defendants specifically identify as evidence to which they must have access (1) the Bat Ray boat itself and (2) documents regarding the design and Seminole's maintenance of the boat and its step ladder. See Defs' Mem. of L. in Supp. of Mot. to Dismiss at 5-8 (Dkt. No. 54-9) (hereinafter Defs.' Mem.).

As a threshold matter, the court notes that defendants may avail themselves of the Federal Rules of Civil Procedure, together with Turks & Caicos rules, to subpoena evidence that is in the control of Seminole, the non-party that is beyond the jurisdiction of this court. Specifically, Fed. R. Civ. Proc. 28(b) allows for depositions to be taken in a foreign country pursuant to letters rogatory, see Fed. R. Civ. Proc. 28(b)(2). In addition, as defendants have recognized, see Defs.' Rep. Mem. of L. in Supp. of Mot. to Dismiss at 10 (Dkt. No. 50-3) (hereinafter "Rep. Mem."), 28 U.S.C. § 1781 codifies a federal court's power to issue letters rogatory or letters of request to a foreign tribunal. Plaintiff has established that Turks & Caicos courts are empowered to honor evidentiary requests from foreign courts. See The Evidence (Proceedings in Other Jurisdictions) (Turks & Caicos Islands), at *1-2, submitted as Ex. 1 to Pltf.'s Aff. in Opp. to Mot. to Dismiss (Dkt. No. 46-1) (hereinafter "Turks & Caicos Proceedings"). The Turks & Caicos procedures specifically provide that, at the request of a foreign court overseeing a civil proceeding, a local court may issue orders for the examination of witnesses, either orally or in writing, for the production of documents, and

for the inspection or photographing of any property.  See id. at Art. 2, ¶ 2(2).  As a general matter

then, all of the evidence to which defendants seek access is available to them by virtue of Turks &

Caicos' jurisdiction over Seminole.

Focusing further on the particular evidence at issue in this case, defendants complain that

"[f]rom a practical standpoint, moving the 'Bat Ray' to this District for examination or inspection

would be extremely expensive and difficult."  Defs.' Mem at 6.  At the outset, it is questionable

whether an inspection of the boat is required in this case because it is not the present condition of

the boat that is at issue.[9]  What is at issue is the condition of the boat at the time of the accident.  The

evidence bearing on this issue is the maintenance and design records for the boat and the testimony

of those charged with maintaining the boat at the relevant time, all of which, as discussed above, is

available to defendants in this forum.  Moreover, defendants cannot seriously assert any need to

transport the boat into this district to conduct an inspection.  Expert witnesses may easily inspect the

boat in Turks & Caicos waters and the live testimony of these experts may be adduced directly at

trial here.  Cf. Arellano v. Starwood Hotels & Resorts Worldwide, Inc., 448 F.Supp.2d 520, 529

(S.D.N.Y. 2006) (dismissing as "silly" an argument that lawsuit should be dismissed in favor of

foreign forum because physical inspection of the premises at issue in the case may be required,

noting that photographs can be sufficient to provide such a view).

---

[9]    Although defendants' argument in this context relates to the possibility of
inspecting the boat, the court analyses this argument under the first Gilbert factor, relating to the
ease of access to evidence, as opposed to the fourth factor, which relates to "the possibility of
view of premises," because "premises" has been understood to have a geographical connotation
and to refer to things such as land and buildings.  See, e.g., In Re Union Carbide Corporation Gas
Plant Disaster at Bhopal, India in December, 1984, 809 F.2d 195 (2d Cir. 1987) (view of
chemical plant); Arellano v. Starwood Hotels & Resorts Worldwide, Inc., 448 F.Supp.2d 520,
529 (S.D.N.Y. 2006) (view of a palace).

As to documentation regarding the design and condition of the boat and its maintenance and repair, defendants concede that they not only have access to, but have actually secured many of the relevant records, see Rep. Mem. at 10. They complain only of a concern that the records in their possession may not be "complete." But having failed to specify the extent to which further documentation is needed, defendants cannot sustain their burden of establishing prejudice in this regard. In any event, as discussed above, defendants may avail themselves of the subpoena power of the Turks & Caicos courts to compel Seminole to produce any additional needed records, and those documents may be easily transported to the United States for use in this lawsuit. Courts have recognized that "the need to photocopy and transport documents is a routine element of American litigation, made less burdensome by advances in transportation and communication." Mitchell v. Club Mediterranee, S.A., No. 00-CV-6947 (KMW) at 5, (S.D.N.Y. Dec. 5, 2001), attached as Ex. B. to Defs.' Mem. (hereinafter "Mitchell") (quoting DiRienzo, 232 F.3d at 65); see also Arellano, 448 F.Supp.2d at 529 (noting that transporting documents to New York is not 'oppressive' or 'vexatious' "particularly given advances in electronic storage and transmission") (citing Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003)). Thus, the presence of the boat and an unidentified number of documents in Turks & Caicos certainly does not weigh in favor of dismissal.

Turning to the second Gilbert factor, the availability of compulsory process for the attendance of unwilling witnesses, defendants specifically identify only two witnesses who are beyond this court's subpoena power but are available for testimony in Turks & Caicos. First, they point to Joseph Lemaire, the principal of Seminole, who they believe has access to documents concerning the boat's service and maintenance and knowledge of the employees who performed these services.

See Defs.' Mem at 7. Notably, although it is true that he is beyond this court's subpoena power, Mr. Lemaire does not assert that he would refuse to attend proceedings here if asked to do so; he attests only that traveling here would be inconvenient for him. See Decl. of Joseph Lemaire, submitted as Ex. B to Defs.' Aff., at ¶ 2 (Dkt. No. 45-2). Defendants also identify plaintiff's treating physician in Turks & Caicos, Dr. Euan Menzies, who, unlike Lemaire, asserts an unwillingness to testify in these proceedings if they are held in New York. Id. at 8. At the outset, as detailed above, and as defendants concede, the depositions of both may be secured and introduced at this proceeding. See Rep. Mem. at 10. Moreover, live witness testimony is not always required. This is especially so when, as in this case, the credibility of the particular witnesses is not really an issue at trial. See, e.g., In re Assicurazioni Generali S.p.A. Holocaust Ins. Litigation, 228 F.Supp.2d 348, 361 (S.D.N.Y. 2002) ("the need for live testimony is less compelling in this case than in many others because the credibility of the various witnesses defendants plan to call is not the threshold issue"). In this case, defendants identify Mr. Lemaire only as an informational witness. They contend that he is needed to ensure that they secure complete documentation and identify other relevant witnesses. See Defs.' Mem. at 6-7. Similarly, it is highly doubtful that the credibility of Dr. Menzies, who first treated plaintiff in Turks & Caicos, will be an issue in this case. Thus, the second Gilbert factor is neutral with respect to dismissal.

Turning to the third factor, the costs associated with obtaining the testimony of willing witnesses who reside abroad, defendants argue that it would be unduly expensive to procure travel for Mr. Lemaire, the only relevant witness who resides abroad and may be willing to testify in New York. As a threshold matter, defendants are large companies with vast resources, rendering it unlikely that the expense of Mr. Lemaire's travel would be particularly burdensome to them. See,

e.g., Mitchell, at p. 6, fn. 1 (quoting Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 107 (2d Cir. 2000)). Moreover, as defendants are in the business of recreational travel, it would seem that arranging his transportation here would be a very slight burden at most. Cf. Massaquoi v. Virgin Atlantic Airways, 945 F.Supp. 58, 62 (S.D.N.Y. 1996). More importantly, because two significant witnesses in this case, specifically plaintiff and her treating physician, reside in this district, it would be at least equally, if not more burdensome for plaintiff to maintain the action in Turks & Caicos, than for defendants to try this case in New York. See, e.g., Giaguaro v. Amiglio, 257 F.Supp.2d 529, 538 (E.D.N.Y. 2003) (noting that even if foreign witnesses are needed in the case, this fact does not favor trial in the foreign jurisdiction because local witnesses are also needed; thus, "wherever the trial takes place, witnesses will be forced to travel to provide testimony") (quoting Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46-47 (2d Cir. 1996)). The third Gilbert factor thus weighs against dismissal and in favor of retaining jurisdiction in this district.

Finally, defendants argue that their inability to implead Seminole as a third party defendant in this forum is another private interest factor weighing in favor of dismissal. Although it is appropriate to consider the benefits of an impleader in deciding a *forum non conveniens* application, see, e.g., Olympic Corp. v.Societe Generale, 462 F.2d 376, 379 (2d Cir. 1972), this factor, like all of the others, must be carefully scrutinized in the factual context of the particular case before the court. Upon close analysis, it does not appear that separate proceedings here (against the Club Med defendants) and in Turks & Cacos (against Seminole) would pose a realistic threat that the defendants would be subjected to inconsistent obligations. This is so because, if found liable to plaintiff in this forum, defendants' primary third party claims are for contractual indemnification by Seminole pursuant to the boat rental agreement between Club Med and Seminole, and for recovery

29

under the Seminole "passenger and comprehensive third party liability" insurance policy mandated by that contract, under which defendants are named as "additional insureds."[10]  Because the legal and factual issues in the main suit and those in potential third party actions differ, there is little likelihood that defendants would be prejudiced by inconsistent verdicts.  For the same reasons, and because the suits would entail little or no duplication of proof, no greater judicial convenience would be achieved by trial in a single forum.  See Reid-Whaled v, Hansen. 933 F. 2d 1390, 1398 (8th Cir. 1991) (defendants' inability to implead third party did not weigh in favor of dismissal); see also Lehman v. Humphrey Cayman, Ltd., 713 F.2d 339, 343-44 (8th Cir. 1983) (citing Olympic Corp., 462 F.2d at 379 (2d Cir. 1972)).

Assuming arguendo that the inability to implead Seminole is a factor that otherwise weighs in favor of dismissal, however, this alone is not enough to warrant dismissal of the case given that all of the other private interest factors do not favor dismissal.  See, e.g., Massaquoi v. Virgin Atlantic Airways, 945 F.Supp. 58, 63 (when "balance of the private interest factors weighs heavily [against dismissal] inability to implead [third-party] is not enough to warrant a dismissal"); see also Olympic Corp., 462 F.2d at 379 ("although the benefits of impleader might be taken into account in deciding

_____

[10]        Article 3 of the Agreement, entitled "Insurance & Indemnification," see Boat Rental Agreement, provides, in part, as follows:

"The Provider [Seminole] shall be solely responsible and shall defend, indemnify and hold harmless Club Med, its parent, subsidiaries and affiliates from and against any liability, loss, or damage incurred or suffered by Club Med, together with expenses incurred, including attorney's fees and cost of suit, arising out of any act or omission of Provider, its agents, subcontractors, officers, employees, or third parties.

The Provider shall immediately cause Club Med and its parent, subsidiaries and affiliates to be named as "Additional Insured" under its passenger and comprehensive third party liability policies . . . for not less than $US 50,000,000 per occurrence . . . ."

whether or not to dismiss for *forum non conveniens*, they are not so important as to counteract the overwhelming evidence that [plaintiff] should be permitted to sue in the United States . . . "); Kvetan v. Employers Contract Services, No. 95-CV-10135, 1996 WL 376935, at *7 (S.D.N.Y. Jul. 5, 1996) (opportunity to seek indemnification from parties not in the lawsuit "weighs against retention of jurisdiction [but] is not ordinarily a dispositive consideration.") (citations omitted).[11]

**(b) Public factors**

The public factors that the court must consider under Gilbert are: "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law." DiRienzo, 294 F.3d at 30-31 (quoting Gilbert, 330 U.S. at 508-09).

As to the first factor, the administrative difficulties associated with congestion in the Eastern District of New York, defendants have offered no evidence with regard to the levels of congestion of this district or of the Turks & Caicos courts, and indeed concede that this factor does not favor either forum. See Defs.' Mem. at 8. Nor is it likely that this case will have a significant impact on

_____

[11]     The cases cited by defendants are distinguishable.  In all of these, the balance of the Gilbert factors, independent of the impleader analysis, weighed strongly in favor of dismissal. In Allstate Life Insurance Co. v. Linter Group Ltd., 994 F.2d 996, 1001 (2d Cir. 1993), for example, the Second Circuit found that because witness credibility was at issue, the inability to obtain live testimony in New York weighed in favor of dismissal, as did the "prohibitive" cost of bringing the witnesses to the United States.  By contrast, the credibility of potentially unavailable witnesses is not at issue in this case, and the cost factor weighs in favor of the plaintiff.  Similarly inapposite is Fitzgerald v. Texaco, 521 F.2d 448, 451 (2d Cir. 1975).  There, although the inability to implead third parties weighed in favor of dismissal, all parties in that case were foreign entities, rendering it "convenien[t] to all parties [to] try[] these cases in the [foreign] courts and . . . vast[ly] inconvenien[t] to all [to] try[] the cases in New York."  Fitzgerald, 521 F.2d at 451.

the court's docket. Cf. Cromer Finance Ltd v. Berger, 158 F.Supp.2d 347, 355 (S.D.N.Y. 2001) ("[w]hile the docket of the Southern District is an active one, courts in this district have shown themselves more than able to address the issues that arise in complex actions in an expeditious and comprehensive manner.").

With regard to the second and third factors, defendants mistakenly argue that New York and its jurors have no interest in the resolution of this case. Generally speaking, "United States courts have a great interest in providing relief to American citizens." Cinar Corp. Securities Litigation, 186 F.Supp.2d at 300.[12] As defendants point out, Turks & Caicos has an interest in resolving disputes arising out of accidents that occur there. On the other hand, a U.S. forum also has an interest in the resolution of a dispute about that accident where, as here, the injured party is one of its residents who makes travel arrangements in and departs from the forum, see, e.g., Wilson v. Humphrey (Cayman) Ltd., 916 F.2d 1239, 1246-47 (7th Cir. 1990) (Indiana plaintiff, who made travel arrangements in and departed from Indiana, injured in Cayman Islands); Lehman v. Humphrey Cayman, Ltd., 713 F.2d 339, 344 (8th Cir. 1983) (Iowa plaintiff, who made travel arrangements in Iowa, injured in the Cayman Islands), especially when the defendant routinely offers vacation packages to residents of the forum. See, e.g., Lehman, 713 F.3d at 344; Massaquoi, 945 F.Supp. at 63; Mitchell, at p. 10. Thus the second and third public interest factors neither favor nor disfavor dismissal.

---

[12] The fact that plaintiff in this case is a New York citizen distinguishes a number of cases upon which defendants rely that grant dismissals on *forum non-conveniens* grounds. See, e.g., Nak Naftogaz, 311 F.3d at 500 (dismissal proper, inter alia, because the case involved a plaintiff that was a citizen of Monaco and the defendant was the state of Ukraine). Moreover, unlike those cases, at least some of the events relevant to this lawsuit, namely the plaintiff's treatment, occurred in this district. See, e.g., Ilusorio, 103 F.Supp.2d at 672 (dismissal proper, inter alia, because plaintiff and one defendant were residents of the Phillippines and all of the important events took place there).

Finally, as to the fourth factor, defendants argue that this litigation would be governed by Turks & Caicos law, an assertion disputed by plaintiff. Even assuming that foreign law applies, however, because questions of foreign law are typically involved in cases in which a *forum non-conveniens* challenge is brought, courts have routinely noted that this factor "standing alone . . . does not justify dismissal." Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 492 (2d Cir. 1998); see also R. Maganlal & Co. v. M.G. Chemical Co., Inc., 942 F.2d at 168 (citing Piper Aircraft, 454 U.S. at 260 n.29); see also Cinar Corp. Securities Litigation, 186 F.Supp.2d at 301. Moreover, any potential burden is even less significant here because the law of Turks & Caicos, a common law jurisdiction, is written in English. See Massaquoi, 945 F.Supp. at 63.

**3. Conclusion**

The ultimate determination of whether *forum non conveniens* dismissal is appropriate requires the balancing of the Gilbert factors in light of the degree of deference afforded a plaintiff litigating in her home forum.

As a threshold matter, the court has determined that plaintiff is entitled to a great degree of deference in choosing her home forum, particularly since there are no indications that her choice was motivated by improper forum-shopping, as opposed to considerations of convenience arising from her residency here. Thus, her "choice will not be overcome unless the relevant private and public interest factors weigh heavily in favor of trial in the alternative forum." R. Maganlal & Co., 942 F.2d at 167-68 (citing Piper Aircraft, 454 U.S. at 255). Faced with this high burden, defendants have been unable to establish that the Gilbert factors weigh so heavily in favor of dismissal that trial in New York would be "oppressive" or "vexatious." Koster, 330 U.S. at 524.

All but one of Gilbert's private factors are neutral towards dismissal. Notwithstanding

defendants' arguments regarding the inaccessibility in this forum of essential evidence, defendants have relatively easy access to this evidence through the assistance of Turks & Caicos courts. Nor have defendants, in the circumstances of this case, demonstrated a need to compel the attendance at trial of the only two witnesses whom they have identified. As to the cost issue, the court is mindful that this lawsuit will "impose burdens on all parties regardless of whether it is located in New York or [the foreign forum]", Rahl v. Bande, 328 B.R. at 412. This is because some of the relevant evidence is in Turks & Caicos, while other relevant evidence is in New York. However, it cannot be said that defendants, multi-national corporations with vast resources, would incur costs so vexatious as to be oppressive, at least not when compared to the costs that plaintiff would incur in traveling to and transporting a witness and documents to Turks & Caicos, and in hiring local attorneys to litigate this lawsuit. Thus, the cost of litigation is a factor weighing the scales strongly in plaintiff's favor. Finally, although defendants' inability to implead a third-party from which it may seek indemnification may create some burden for defendants, this fact alone is not dispositive and, in any event, only slightly tips the scales back in defendants' favor.

Similarly, Gilbert's public interest factors are substantially neutral towards dismissal. It cannot be said that either the congestion in this district, or the potential need to apply the laws of an English-speaking foreign forum pose a burden on this court. Moreover, this lawsuit has connections to both the United States and Turks & Caicos. This is so because, although the accident occurred in Turks & Caicos and some of the defendants are either Turks & Caicos companies or have business interests there, the plaintiff is a New York resident who purchased her vacation package in New York, and defendants routinely offer such packages to New York residents. Thus, the courts and the jurors of both New York and Turks & Caicos have an interest in the outcome of this lawsuit.

Given the totality of circumstances, the private and public <u>Gilbert</u> factors are at best neutral towards dismissal, if not slightly favoring plaintiff because of the burden of the costs associated with her litigating in a foreign jurisdiction. Defendants have therefore failed to establish that defending this suit in New York would be so burdensome and oppressive as to warrant dismissal, particularly in light of the high degree of deference owed to plaintiff's choice of her home forum. "<u>Gilbert</u> tells us that unless the balance strongly favors defendants, plaintiff's choice of forum 'should rarely be disturbed'." <u>DiRienzo</u>, 294 F.3d at 30-31 (quoting <u>Gilbert</u>, 330 U.S. at 508).

The motion to dismiss on *forum non-conveniens* grounds is thus denied.

## CONCLUSION

For the foregoing reasons plaintiff's motion to remand to state court (Dkt. No. 47), and defendants' motion to dismiss on the grounds of *forum non-conveniens* (Dkt. No. 45), are denied.

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated: March 21, 2008
        Brooklyn, New York

SERVICE LIST:

**Counsel for Plaintiff**

Ravi Batra
142 Lexington Avenue
New York, NY 10016

**Counsel for Defendants**

David Alexander Abrams
Strongin, Rothman & Abrams, LLP
50 Broadway
Suite 2003
New York, NY 10004

cc:        Magistrate Judge Matsumoto